NICHOLAS VARDA, Respondent, v. JOSEPH B. LYNCH, Appellant.

Third Department, November 24, 1922.

Assault and battery — action against sergeant of State Police — verdict in favor of plaintiff against weight of evidence.

In an action to recover damages for assault and battery alleged to have been committed on the plaintiff by the defendant, a sergeant of the State Police, *held*, that the verdict in favor of the plaintiff was against the weight of the evidence.

H. T. KELLOGG, Acting P. J., and HASBROUCK, J., dissent.

APPEAL by the defendant, Joseph B. Lynch, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Clinton on the 24th day of April, 1922, upon the verdict of a jury for $1,000, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes.

The action was brought to recover damages for an alleged assault upon the plaintiff by the defendant, a State trooper, made while the plaintiff was a prisoner.

*Charles D. Newton, Attorney-General [Edward G. Griffin, Deputy Attorney-General,* of counsel], for the appellant.

*Judge & Collins [John K. Collins* of counsel], for the respondent.

HINMAN, J.:

It may well be that an assault was committed and that justice cries out for that which the law offers in retribution, but there is something more in the decision of this case than doing justice to the plaintiff.

The fair rights of the defendant Lynch are equally involved. If he was not guilty of this ill usage of the plaintiff which, if it occurred, was an ignominious and cowardly attack upon a helpless prisoner without reasonable or just excuse, it follows with obvious and equal force that the victim of this verdict has been unrighteously subjected to that ignominy and unrighteously held up to the public scorn which should be felt toward one who would commit such an assault. The responsibility is ours to determine whether the record demonstrates the righteousness of this judgment against him. No feeling of sympathy for the plaintiff and no thought of the responsibility of the State Police as a whole, upon the theory that such an offense was committed by one of the members, should play any part in the determination whether this verdict is against the weight of the evidence.

There is no rule better settled in the law than that a plaintiff bringing a defendant into court upon a certain charge and swearing to the facts tending to substantiate that charge in an action at law shall be held responsible for his own theory and can command a recovery only upon that theory. This is very important in the determination of this case since the testimony of the plaintiff and of his witnesses demonstrates two entirely different assaults committed upon the plaintiff, one of which was testified to by the plaintiff and the other of which was testified to by his witnesses. If we are to consider the assault to which the plaintiff testifies, his testimony is discredited and impeached by his own witnesses. If we are to consider the assault to which his witnesses testified, then the plaintiff cannot recover because it is contrary to the theory of his cause of action as pleaded and as proved by himself. I think this can be amply demonstrated by a review of the testimony.

The theory of the plaintiff's complaint is that the defendant struck the plaintiff with a blackjack or butt of a heavy revolver or some other weapon, the exact nature of which is unknown to the

plaintiff, " violently knocking plaintiff to the ground, " and then kicked the plaintiff.    Upon the witness stand the plaintiff explained the assault as follows: " He opened the door and dragged us out of the car.   We were handcuffed and he dragged us out of the car. The first thing he does he hits Jim Powers behind the ear with a blackjack.    *   *   *   He hit Jim Powers with a blackjack right here and Jim Powers goes into a faint.   While he goes in a faint he pulls me down; and while I was leaning in this position they hit me with the butt of a gun   *   *   *.   Q. Who hit you?   A. Sergeant Lynch   *   *   *.   Q. What did they do to you beside that, while you were outside of the car?   A. The only thing they did they hit me.   Q. I am speaking now about Lynch.   A. The first thing he did he hit me right through here, on the head.   The blow was so stunning that really I was in a daze and I didn't know what was coming after; but I was kicked falling down and both of us falling down and they kicked us; and when we got up he punched us again in the face.   Q. After you were in the car did he strike you in the car?   A. No, sir, he did not."

Not one of the witnesses sworn by the plaintiff in corroboration saw him hit outside the car.   Boire swore: " Then a couple of troopers came and I saw one of the troopers search the fellows, *   *   *   outside the car.   Q. How far from the car?   A. Couple of feet.   *   *   *   Then they [Varda and Powers] got back in the car and I seen some fellow lean over in the car.   *   *   *   I saw a fellow in the car.   I was outside the car and I saw Varda and Powers' heads go down, one in each corner.   Q. Who was in the car when Varda and Powers' heads went down?   A. Lynch."

Wilmer Yell says that he walked around there and " didn't see anything *until after I got back* from my chores at the barn.   *   *   * I see a State Trooper hitting them *in* the car *as I was coming from the barn.*   *   *   *   He was hitting him with his right fist.   *   *   * I had just been to the barn while doing the chores."

Dennis Yell testified: " I see them take them out of the car and search them and they put them back in the car; and after a while they took them out again and brought them by the side of the house or shed.   I could hear them making kind of a noise.   I didn't know whether they were choking them or not.   *   *   *   They put them back in the car and punched them and kicked them. *   *   *   Q. And where was Mr. Varda when Mr. Lynch was pounding him?   A. In the car.   *   *   *   Q. When you saw that Mr. Lynch was pounding Mr. Varda and Mr. Powers, what did you do?   A. I went to the barn.   Q. For what?   A. I went to the barn to talk about it with my father.   Q. And did your father go up to the automobile then?   A. He came afterward.   He fed his horse

Third Department, November, 1922.          [Vol. 203

and then he came up there. Q. Were you with him? A. Yes, sir. Q. Did you hear the conversation between your father and Sergeant Lynch when your father got there? A. Yes. I heard my father tell him he didn't want any more of that pounding done there." In connection with this last testimony as to the conversation between the father and Lynch the father (Wilmer Yell) testified: " Q. Did you see him [Lynch] hitting both of them? A. Yes, sir. Q. Did you say anything to this trooper, Sergeant Lynch? A. I didn't say just to him. I come along behind the car and said ' I don't want them to have that man abused in my yard,' and nobody answered."

Jessie Yell testified: " I was in the other room and I come out in the kitchen and I just happened to look out doors and I see them. I saw a trooper hitting the two fellows *in* the car. * * * Q. How many troopers were there in the car when the pounding was going on? A. Only one."

The above were all of the witnesses of the plaintiff who testified with reference to where the assault took place. All of them testified that it took place in the car, whereas the plaintiff testified that all of the assault took place outside of the car upon the ground in accordance with his complaint and that he was not assaulted afterward in the car. Boire saw them taken out and searched, put back in the car and then immediately assaulted. Wilmer Yell saw them assaulted in the car after he had come from the barn, whereupon he approached the defendant as he says and upbraided him for abusing the man in his yard. His son Dennis contradicts Boire in that there was a second removal from the car after they had been searched and returned to the car; that they were removed to the side of the house where he heard noises of choking and then put back in the car where he saw them punched by Lynch. Thereupon Dennis went to the barn to tell his father about it and when it was all over, according to Dennis, his father came to the scene and he heard his father tell Lynch that he didn't want any more pounding done there. Jessie Yell also swears that the assault took place in the car. Surely perjury is rampant in the camp of the plaintiff with suspicion pointing as readily at the plaintiff as at his witnesses for he is an interested party.

Let us scrutinize the testimony a little further. The plaintiff says a Ford commercial car with four or five State troopers came to the place and immediately two of them came over to the car, Lynch and another. Lynch cursed him and dragged them out of the car and immediately assaulted them. Boire says a couple of troopers came over, took them out of the car, searched them, put them back in the car and then assaulted them in the car. Dennis Yell says

they took them out and searched them, put them back in the car and after a while took them out again, brought them to the side of the house when choking noises were heard by him. Then they were put back in the car and then and there they were punched and kicked. Upon this phase of the case plaintiff's testimony is absolutely irreconcilable with that of his witnesses.

This occurred on the eighteenth of November. The shortest days of the year were at hand. According to the almanac the sun set that day at four-twenty-five and the moon rose at seven-forty-six P. M. The time of this assault is very important since it marks discrepancies between the testimony of the plaintiff and his witnesses and also has a bearing upon the question whether the defendant could have been present at the time when the alleged assault took place according to the version of the plaintiff. The plaintiff says that at the time he was assaulted it was " broad daylight; started to get dark; just getting dark. Q. But you could see everybody? A. Yes. Q. You could see the house? A. Yes." He could see the Ford commercial truck when it arrived; he could see the troopers who arrived; he saw the two troopers come directly to his car, described their apparel. His counsel tried to get him to say " it was in the night time," but this he did not do. He says the only thing he could see was the chest of Lynch because he was sitting in the car as Lynch approached and when he was outside the car he was too excited to pay attention to Lynch's attire. He says that he was brought to Yell's house about three o'clock; and that it was about an hour before the troopers, who arrived with the Ford truck, got there. This would make the time of the assault four to four-thirty, just before or at sundown. Sergeant Herrick and the other troopers with him say they arrived with the Ford truck at about four o'clock. Inspector Riley, one of the plaintiff's witnesses, says that Sergeant Herrick was one of the troopers who arrived at that time and that he thinks the time of his arrival was " somewhere around four." Riley also testifies that there were several other troopers who arrived with Herrick at that time; and that it was really dark by five o'clock. Thus taking the plaintiff's own theory of the assault, as we must, it occurred before dark. He says it occurred before dark and confirms it by saying that upon the arrival of the truck two of the troopers came straightway to his car, dragged him out and assaulted him. Boire says it was " about 3:30 or such a matter " when the plaintiff was put into the car; that he saw the two troopers come to the car and saw one of them, Trooper Spinks, search the fellows outside the car, then put them back in the car at which time he says the assault was committed in the car. If he actually saw any assault, which is incredible

if the plaintiff is truthful in his narration of the facts, what he did see must have happened about four o'clock in the afternoon. He does not deny on cross-examination that he told Griffin, Captain Broadfield and Sergeant Lynch before the trial that "if there was any rough house toward any of these prisoners it happened at four o'clock in the afternoon long before Lynch got there." He simply says: "I don't remember." Wilmer Yell says he saw the assault in the car after he got back from his chores at the barn which "must have been a little after five." He says: "it was dark." Again he says: "it was some time after five." He says: "Q. Dark outside? A. Yes." Again on cross-examination he says: "It was dark anyway * * *. It was quite dark." Dennis Yell says it was dark and that his father had a lighted lantern when he came up to the automobile from the barn which was immediately after the assault, which he testifies he saw himself, then told his father about it and then his father came from the barn and saw it although according to Dennis the assault was all over. Mrs. Yell, who apparently knew nothing about it when she was questioned before the trial, says that she saw the assault from inside the house and that it took place about five or half past five; that she happened to look out and as she looked they were pounding the men. She says she could not recognize which trooper was doing it because it was "kinda dark." She says that she overheard the conversation between her husband and the trooper about not wanting any more of that kind of abuse, although she was in the house and her husband and Dennis say that it happened alongside the car. At that season of the year with snow on the ground, the doors and windows must have been closed. Jessie Yell, the daughter, was in the kitchen and "just happened to look out doors" and she saw the assault in the car which she was able to see because there was a light in the car. She fixes the time at about half past five. Again on the question of time when this alleged assault took place we find the plaintiff and his witnesses discredited by each others' testimony. If the plaintiff is to succeed it must be upon the basis of his own story and yet he is discredited by his own witnesses.

This leads us to the vital question raised by the defense as to the identification of Lynch as the possible assailant if an assault was committed. Taking the theory of the plaintiff himself as expressed in his testimony, we find that the weight of the testimony is clearly in favor of the defendant. The assault complained of by the plaintiff was committed according to his story about four or four-thirty. It is uncontradicted that Lynch was the desk sergeant of the troop with headquarters at Malone. The plaintiff says he was arrested about three o'clock. Waterman, the injured trooper, was later

brought to the house. It took some time to discover his whereabouts and to bring him to the house. It was after Waterman was brought to the house, which was not earlier than three-thirty, that the Mooers operator was called to get a doctor. This time is fixed by undisputed testimony as substantially the time when the Mooers operator informed Sergeant Herrick and informed defendant Lynch at headquarters at Malone. If Sergeant Lynch was at headquarters, which is undisputed, he could not have received the information sooner than that time. Dugan confirms the fact that Sergeant Herrick telephoned Malone about four o'clock when he arrived. Certainly the plaintiff's story as to when the assault took place cannot be confirmed by any assumption that Lynch could have arrived at the scene of action in time to have committed the assault after having received either of these two telephone calls. The distance was forty-two miles, to be traveled by a Ford car with a heavy snow on the ground and with time taken out along the way to inquire as to the whereabouts of the Yells' house. In addition to this there was a stretch of several miles of very bad road leading to the Yells' house. There is every probability that the journey would have consumed at least two hours in the circumstances. If they had started promptly at three-thirty they could not have have arrived before five-thirty. It is not against the probabilities that the testimony of Lynch and Captain Broadfield is to be believed that they started about four. This would have brought them to the Yells' house not earlier than six o'clock, which is the time testified to by the defendant's witnesses. The theory of the plaintiff's counsel is that Lynch arrived, as he said, with Captain Broadfield at about the time fixed by Lynch except that plaintiff's counsel fixes the hour at five-thirty, the time testified by Jessie Yell as the time of the assault. The theory of the plaintiff's counsel is that Lynch committed this assault immediately upon his arrival at that time. Neither Dugan nor Riley was able to say that he had seen Sergeant Lynch or Captain Broadfield upon the premises prior to the assault.

The identification of Lynch rests upon the testimony of the plaintiff, of Boire, of Wilmer Yell and Dennis Yell, all of whose testimony has been shown to be so utterly discredited. Waterman says that Captain Broadfield arrived around six o'clock and after sitting in the house with him about half an hour went out. The plaintiff says that Captain Broadfield came out of the house and came over to the car and questioned him. Dugan says that Captain Broadfield and the defendant came into the house while he was there. Newing was on the porch and saw the arrival of Captain

35

Third Department, November, 1922. [Vol. 203

Broadfield and the defendant about six or six-thirty and says they went into the house. Sergeant Herrick says that as he came back from his search about six o'clock Captain Broadfield and Sergeant Lynch came in from Malone; that they went over and spoke to Newing and then went into the house where they remained probably a half hour. Starks, a game protector, says that about six o'clock Lynch and Captain Broadfield entered the house and that he did not see Lynch or Captain Broadfield there before six o'clock. Captain Broadfield testifies that he and Lynch left Malone between three-thirty and four o'clock; that the road was in very bad shape; that they got stuck two or three times; that they had to inquire for the home of Mr. Yell at two places; that he would judge that they arrived at Yells' house between six and six-thirty; talked with Newing; went into the house; talked with Waterman and Dugan; helped to put Waterman into the ambulance, which Dugan says took place about six-fifteen and which coincides with the story told by the defendant's witnesses as to the time of the arrival of Broadfield, and that then he went out to the car and interviewed the plaintiff and his companion. He says that during all of this time Lynch was with him and that Sergeant Herrick and Lynch came to the car with him, Lynch taking notes. The plaintiff confirms this, saying that right behind Captain Broadfield as he talked to him in the car stood a State trooper and that there was another man standing there taking notes who he says was Mr. Dugan; but according to the story of Dugan, Dugan had left in the ambulance.

The story of Lynch wholly coincides with the story of Captain Broadfield and is straightforward and unimpeached. It would be an enormity of injustice to say that the plaintiff had met the burden of proof in this case upon his own testimony and that of his witnesses and to say that he has met that burden upon such testimony simply because the defendant says that he did not notice any marks on the plaintiff's face as he sat there in the dim light of that car, which might very well be true because he was standing back of Captain Broadfield and was absorbed in taking his notes. Even assuming that the testimony of Lynch that he " didn't see any " marks on the plaintiff's face may permit the inference that he was evasive, it is important to note that he did not say that there were none. He was not asked whether he looked at the plaintiff nor is it shown that from where he stood back of the captain taking notes he was in a position to see marks on the plaintiff's face. Plaintiff's witness Dugan went out of the house to investigate the matter when he was told about an assault and he saw only " some blood on the front of his nose. * * * It looked it might have been a nose bleed." Are we to decide this appeal upon such a slender inference

of dissimulation bearing upon the credibility of Lynch's testimony which is well sustained by evidence and probabilities as to the time of his arrival, when the testimony of the plaintiff, who carries the burden of proof, is shot to shreds by that of his own witnesses? And if we are to consider the appeal upon the basis of dissimulation upon collateral issues, the plaintiff's testimony is permeated with it. He dissimulated about his connection with the men who ran the other car. He told his counsel that he went to Montreal every summer by automobile, but on cross-examination he said it was only his second trip there by automobile. He had been going there every year since 1902 and yet he swears he got off the road because he was a stranger there; that he got off the regular road and did not know how to get back; that he had to be directed as to roads. He was trying to evade the charge that his business was that of rum-running and smuggling. With all the foregoing considerations bearing upon the weight of the evidence, surely it is permissible to add that doubt as between the testimony of a confessed criminal and that of a public officer would have to be resolved in favor of the latter, because of the presumption always indulged in the law that a public officer will do his duty, not grossly violate it, as charged here.

We have an intimation in this case that Trooper Drulette committed this assault, if any one. He had a right to protect himself by refusing to testify upon the ground that it might incriminate him. He was compelled to testify because he was subpoenaed and it is clear as day that if he had not been placed upon the stand his absence would have been accounted for before that jury to the disadvantage of the defendant.

Under all of these circumstances it is our plain duty to reverse this judgment and to order a new trial upon the ground that the verdict is clearly against the weight of the evidence. It is our duty to say that we disapprove of the finding that, if an assault was committed as alleged and sought to be proved by the plaintiff, such assault was committed by the defendant Lynch.

The judgment and order should be reversed upon the facts and a new trial granted, with costs to the appellant to abide the event.

KILEY and VAN KIRK, JJ., concur; H. T. KELLOGG, Acting P. J., and HASBROUCK, J., dissent.

Judgment and order reversed upon the facts, and new trial granted, with costs to the appellant to abide the event.